| | | |
|---|---|---|
| JULIANNE M. MARTINY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-CV-2625-SPM |
| | ) | |
| | ) | |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Deputy Commissioner of Operations, | ) | |
| Social Security Administration, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

This is an action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final

decision of Defendant Nancy A. Berryhill, Deputy Commissioner for Operations, Social Security

Administration (the "Commissioner") denying the application of Plaintiff Julianne M. Martiny

("Plaintiff") for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act,

42 U.S.C. §§ 1381, *et seq.* (the "Act"). The parties consented to the jurisdiction of the undersigned

magistrate judge pursuant to 28 U.S.C. § 636(c). (Doc. 8). Because I find the decision denying

benefits was supported by substantial evidence, I will affirm the Commissioner's denial of

Plaintiff's application.

## I.    PROCEDURAL BACKGROUND

On December 18, 2013, Plaintiff applied for SSI, alleging that she had been unable to work

since September 1, 2008, due to a herniated disc, chronic lower back pain, chronic headaches,

inability to concentrate, blurred vision, intermittent vertigo, nausea, immune dysfunction, failure

to recover after a hysterectomy and sinus surgeries in 2012, chronic fatigue and infections, chest pain, chronic sinusitis, chemical sensitivities and allergies, left hand and wrist problems, weakness and pain in her right elbow, and adrenal dysfunction. (Tr. 172, 200). Her application was initially denied. (Tr. 117-21). On April 28, 2014, Plaintiff filed a Request for Hearing by Administrative Law Judge (ALJ) (Tr. 124). Plaintiff subsequently amended her alleged onset date to December 1, 2013. (Tr. 195). On November 19, 2015, the ALJ held a hearing on Plaintiff's claim. (Tr. 47-87). On September 8, 2016, the ALJ issued an unfavorable decision. (Tr. 8-46). On August 23, 2017, the Social Security Administration's Appeals Council denied her request for review. (Tr. 1-7). Plaintiff has exhausted all administrative remedies, and the decision of the ALJ stands as the final decision of the Commissioner of the Social Security Administration.

## II.    FACTUAL BACKGROUND

At the hearing before the ALJ, Plaintiff testified as follows. Plaintiff has worked for a number of years as a chiropractor and still has a valid license. (Tr. 52). She treats clients sporadically, but when she does so it wipes her out for two or three days. (Tr. 53). She last had an active office in about 2009 or 2010. (Tr. 53). She shut down her practice because of a combination of physical problems: herniated discs in 2008 that reduced her strength and stamina, heavy periods "to the point of hemorrhaging," and anemia that caused her to have to stay home for seven to ten days out of the month. (Tr. 57). In 2012, she had a hysterectomy. (Tr. 57). When her back pain first started, she went to her primary care physician and was prescribed Celebrex and Flexeril. (Tr. 58). She has not seen an orthopedic surgeon or neurosurgeon for her back. (Tr. 58). She has seen several different chiropractors for her back pain, and it has helped her get out of acute episodes. (Tr. 59). She also sometimes takes pain medications, such as anti-inflammatories. (Tr. 59). If it is a really bad day, she may take hydrocodone or oxycodone. (Tr. 60). Plaintiff testified that "it is

hard to focus on anything when you're constantly spending energy to tune out pain." (Tr. 59). She testified that she used to walk around the neighborhood, but can no longer walk long distances without back or leg pain. (Tr. 59-60). She can walk about 30 feet before needing to rest. (Tr. 60). She has a chair in front of the stove that she kneels on or sits on when she is cooking. (Tr. 60). She also has to stretch often. (Tr. 61). She testified that the pain "becomes the whole focus of [her] attention unfortunately." (Tr. 61).

Plaintiff has tension headaches, migraine headaches, and sinus headaches. (Tr. 81). She has migraines about once a month, and they last all day. (Tr. 82). She becomes sick, cannot stand light and sound, takes strong pain pills, and sleeps. (Tr. 82). She gets tension or sinus headaches several times a month. (Tr. 84). Plaintiff had sinus surgery, and after that the pain in her head went away for a while. (Tr. 69). However, she still gets sinus infections every month or two. (Tr. 69).

Plaintiff has dizziness or vertigo a couple of times a week. (Tr. 69-70). It lasts minutes to hours. (Tr. 70). When it happens, she has to touch the walls to help her navigate. (Tr. 70). On days when it happens, she does not drive, and just stays at home. (Tr. 71). She had a tendon rupture in her left thumb and still has problems with it being weak. (Tr. 72-73). This causes her to lose the ability to pick up anything heavy or to grasp things. (Tr. 73). She is right-handed. (Tr. 74). Plaintiff also has numbness in her hands. (Tr. 75).

Plaintiff was diagnosed by a chiropractor with fibromyalgia. (Tr. 64). She testified that about a month after her sinus surgery in 2012, she started having burning and spasming in her elbows and other parts of her body. (Tr. 65-66). She has had a burning in her left ankle and hands as well. (Tr. 66). The fibromyalgia is "just yet one more thing that contributes to pain that [she] ha[s] to either tune out or try to tone down with painkillers." (Tr. 67). Plaintiff also testified that

she has Hashimoto's thyroiditis. (Tr. 67). She testified that she is not taking thyroid medication but is doing supplementation. (Tr. 68).

Plaintiff is being treated for sleep apnea. (Tr. 77). She uses a CPAP machine at night. (Tr. 78). It helps "to some degree" with her daytime fatigue. (Tr. 78). She rates her fatigue at a five to eight on a scale of one to ten. (Tr. 78).

Plaintiff also testified that she is being treated for depression. (Tr. 68). She takes Celexa and occasionally sees a counselor. (Tr. 68). Plaintiff's medications help her depression to the extent that she no longer wants to stay in bed all day. (Tr. 79). She has crying spells less frequently since she started Celexa. (Tr. 79). Plaintiff testified that she is forgetful. (Tr. 79).

Plaintiff is also being treated for anxiety. (Tr. 80). She takes Buspar as needed. (Tr. 80). She usually takes it whenever she has to leave the house. (Tr. 80). Leaving the house causes her anxiety because she has to fit into a schedule, meet other people's expectations, pull herself together, or be in a crowd. (Tr. 81).

In Plaintiff's function report, completed on January 27, 2014, she stated that she can no longer do many things that she used to be able to do, such as lifting things, gardening, mowing the lawn, shoveling snow, cleaning house, reading or working on the computer for hours, cooking elaborate meals, and seeing patients for physical manipulation and analysis. (Tr. 213). She stated that she had done no gardening at all in the past year. (Tr. 216). She reported that she is often so weak that she has to sit on the toilet to dry and fix her hair and has to sit down to shower. (Tr. 213). It takes her two hours to vacuum due to the rest periods she needs. (Tr. 214). She does drive, but her headaches and vertigo make her feel unsure of herself. (Tr. 215). She is able to pay bills, handle a savings account, count change, and use a checkbook. (Tr. 215). She has difficulty lifting even less than twenty pounds; she can no longer walk more than 500 feet without resting; bending

4

over makes her dizzy or start coughing; standing makes her back hurt; and sitting for more than 20 minutes makes her back hurt. (Tr. 217). She cannot pay attention for more than ten minutes. (Tr. 217). She does not handle stress well and does not handle changes in routine well. (Tr. 218). She sometimes uses a back brace when her back hurts severely, when she is going to be standing for a prolonged period, or when she has to lift something. (Tr. 218). She did not indicate that she uses a cane. (Tr. 218).

With respect to the medical and vocational records, the Courts accepts the facts as presented in the parties' statements of fact. The Court will cite specific records as needed in the discussion below.

### III.   STANDARD FOR DETERMINING DISABILITY UNDER THE ACT

To be eligible for benefits under the Social Security Act, a claimant must prove he or she is disabled. *Pearsall v. Massanari,* 274 F.3d 1211, 1217 (8th Cir. 2001); *Baker v. Sec'y of Health & Human Servs.*, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines as disabled a person who is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010). The impairment must be "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot, considering his [or her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he [or she] lives, or whether a specific job vacancy exists for him [or her], or whether he [or she] would be hired if he [or she] applied for work." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. 20 C.F.R. § 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process). At Step One, the Commissioner determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then the claimant is not disabled. 20 C.F.R. § 416.920(a)(4)(i); *McCoy*, 648 F.3d at 611. At Step Two, the Commissioner determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, the claimant is not disabled. 20 C.F.R. §§ 416.920(a)(4)(ii), 416.920(c); *McCoy*, 648 F.3d at 611. At Step Three, the Commissioner evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings"). 20 C.F.R. § 416.920(a)(4)(iii); *McCoy*, 648 F.3d at 611. If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the Commissioner proceeds with the rest of the five-step process. 20 C.F.R. § 416.920(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the Commissioner must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his or her] limitations." *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. §§ 416.920(e), 416.945(a)(1). At Step Four, the Commissioner determines whether the claimant can return to his or her past relevant work, by comparing the claimant's RFC with the physical and mental demands of the claimant's past relevant work. 20 C.F.R. §§ 416.920(a)(4)(iv), 416.920(f); *McCoy*, 648 F.3d at 611. If the claimant can perform his or her past relevant work, the claimant is not disabled; if the claimant cannot, the analysis proceeds to the next step. *Id.* At Step Five, the Commissioner considers the claimant's RFC, age, education, and work experience to determine

whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled. 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(g), 416.960(c)(2); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523. At Step Five, the burden shifts to the Commissioner to establish that, given the claimant's RFC, age, education, and work experience, there are a significant number of other jobs in the national economy that the claimant can perform. *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 416.960(c)(2).

## IV.   THE ALJ'S DECISION

Applying the foregoing five-step analysis, the ALJ here found that Plaintiff has not engaged in substantial gainful activity since December 1, 2013, the amended alleged onset date; that Plaintiff had the severe impairments of degenerative disc disease and facet osteoarthritis of the lumbar spine, mild degenerative changes of the thoracic spine, chronic sinusitis, obesity, depressive disorder, post-traumatic stress disorder, and somatoform disorder; and that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (Tr. 13-25). The ALJ found that Plaintiff had the following RFC:

> [Plaintiff] has the residual functional capacity to perform light work as defined in 20 C.F.R. 416.967(b), with the following additional limitations: she can frequently lift, carry, push and pull 10 pounds, and can occasionally lift, carry, push and pull 20 pounds; can stand and/or walk for six hours total in an eight-hour workday; can sit for six hours total in an eight-hour workday; can frequently climb ropes and stairs; can occasionally stoop, kneel, crouch, crawl, balance, and climb ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme cold and heat; must avoid even moderate exposure to hazards such as unprotected heights and moving machinery; and is limited to performing simple, routine, repetitive tasks.

(Tr. 25). At Step Four, the ALJ found that Plaintiff could not perform her past relevant work as a chiropractor. (Tr. 38). At Step Five, relying on evidence from a vocational expert, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including representative occupations such as office helper, photocopy machine operator, and semiautomatic sewing machine operator. (Tr. 38-39). The ALJ therefore found that Plaintiff had not been under a disability, as defined in the Act, since, December 1, 2013. (Tr. 39).

## V.  DISCUSSION

Plaintiff challenges the ALJ's decision on four grounds: (1) the ALJ failed to properly consider Plaintiff's somatoform disorder in making the RFC finding; (2) the ALJ erred at Step Two by finding Plaintiff's headaches were not a severe impairment; (3) that remand is required because there was new evidence submitted to the Appeals Council that is not included in the administrative transcript, and therefore Defendant has deprived the Court of the ability to review the case properly; and (4) that the ALJ failed to fully and fairly develop the record with regard to Plaintiff's sleep apnea, because the record contained reference to a sleep study and the ALJ failed to obtain the results of the study.

### A.  Standard for Judicial Review

The decision of the Commissioner must be affirmed if it complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole. *See* 42 U.S.C. §§ 405(g); 1383(c)(3); *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009); *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002). "Substantial evidence 'is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion.'" *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting

*Moore*, 572 F.3d at 522). In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision. *Id.* However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'" *Id.* at 1064 (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

## B. The ALJ's Consideration of the Effects of Somatoform Disorder on Plaintiff's RFC

Plaintiff's first argument is that the ALJ failed to properly consider Plaintiff's somatoform disorder in making the RFC finding. In assessing Plaintiff's somatoform disorder in the RFC analysis, the ALJ stated:

> As for her somatoform disorder, the record shows that this diagnosis was assigned after the claimant presented to the emergency department of St. Joseph's Hospital West on March 21, 2014 with complaints of twitches or spasms in the right upper extremity that had been present for one day (Exhibit 14F). The claimant also reported numerous other physical symptoms at that time (Exhibit 14F). While she was in the emergency department, the claimant was observed to exhibit several episodes of right upper extremity flailing and pelvic thrashing (Exhibit 14F). She also exhibited a resting tremor in the right arm and an intention tremor in the right hand with slight ataxia (Exhibit 14F). However, her neurological examination showed no underlying neurological abnormality (Exhibit 14F). Her right upper extremity tremor generally resolved when she was distracted in conversation (Exhibit 14F). Her motor examination varied with effort, but no obvious focal deficit was noted, and her sensory examination was intact to multiple stimuli throughout (Exhibit 14F). A CT scan of the head was performed, and showed no acute abnormality (Exhibit 14F). The treating neurologist concluded that her movements were not neurogenic in nature, and instead were likely psychogenic (Exhibit 14F). The claimant did report significant life stressors at that time,

including lack of employment and her pending application for disability benefits (Exhibit 14F). Her treating physician suggested that she seek psychiatric or behavioral treatment, but the claimant declined such treatment while she was hospitalized (Exhibit 14F). She was diagnosed with unspecified somatoform disorder, and was discharged home on March 22, 2014 (Exhibit 14F). **The undersigned notes that the claimant's somatoform disorder appeared to manifest mainly with the extremity tremor and spasms (Exhibit 14F), which were short-lived, as the record does not document any recurrent tremors, extremity twitching, or pelvic spasms. Her other many reported symptoms at that time, including vertigo, headaches, temporary hearing loss, and back pain (Exhibit 14F), have been largely deemed of physical rather than mental origin, and are symptoms of various severe or non-severe impairments as discussed in detail above.**

(Tr. 29) (emphasis added). The ALJ also found that Plaintiff's "somatoform disorder, in conjunction with her physical impairments, requires her to avoid even moderate exposure to hazards such as unprotected heights and moving machinery." (Tr. 29).

Plaintiff argues that in this analysis, the ALJ "failed to properly consider somatoform disorder under the *Diagnostic and Statistical Manual for Mental Disorders, Fifth Edition* (*DSM-5*) criteria, published on May 18, 2013." Pl's Br., at 3. Plaintiff argues that the "updated *DSM-5* criteria . . . specifically changed the criteria to include a disorder which can sometimes be explained by a medical condition." Pl's. Br, at 5.[1] Plaintiff argues that because the ALJ failed to apply these updated criteria, the ALJ improperly limited his analysis of Plaintiff's somatoform disorder to Plaintiff's symptoms that did not have a physical origin (her extremity tremors and spasms), instead of analyzing her somatoform disorder in light of all of her symptoms, including those that arose from an underlying medical condition, such as her back pain. Plaintiff argues that this resulted in a deficient RFC finding.

---

[1] Plaintiff does not actually cite to any language from the *DSM-5* for this argument, but instead cites to the abstract of a Dutch-language journal article about the changes in the *DSM-5*, https://www.ncbi.nlm.nih.gov/pubmed/24643828, and to an article on the website Medscape discussing the changes to the DSM-5, https://emedicine.medscape.com/article/294908-overview.

The Court finds Plaintiff's argument to be without merit for several reasons. First, Plaintiff has not cited, and the Court has not found, any legal authority requiring the Commissioner to apply the criteria of the *DSM-5* in analyzing cases. In the listings, the Commissioner defines "somatoform disorders" as "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.07. The ALJ's analysis of somatoform is consistent with that definition, and Plaintiff points to nothing to suggest that that the ALJ's apparent reliance on that definition, or a similar definition, was improper.

Second, "somatoform disorder," with which Plaintiff was diagnosed, is not a disorder described in the *DSM-5*. In an earlier version of the *DSM,* the American Psychiatric Association described a set of "somatoform disorders," with one common feature being "the presence of physical symptoms that suggest a general medical condition . . . and are not fully explained by a general medical condition, by the direct effects of a substance, or by another mental disorder." American Psychiatric Association, *Diagnostic and Statistical Manual* 485 (4th ed., Text Revision 2000) ("*DSM-IV-TR*").[2] However, the *DSM-5* does not describe "somatoform disorders" and does not list any disorder whose title includes the term "somatoform disorder." Instead, it sets forth a set of "reconceptualized diagnoses, based on a reorganization of *DSM-IV* somatoform disorder

---

[2] There are several specific disorders listed under the general category of "Somatoform Disorders" in the *DSM-IV*, two of which have titles that include the word "somatoform." "Undifferentiated Somatoform Disorder" involves complaints of symptoms that "cannot be fully explained by any known general medical condition or the direct effects of a substance (e.g., the effects of injury, substance use, or medication side effects), or the physical complaints or resultant impairment are grossly in excess of what would be expected from the history, physical examination, or laboratory findings (Criterion B)." *DSM-IV-TR*, at 490-91. "Somatoform Disorder Not Otherwise Specified" includes "disorders with somatoform symptoms that do not meet the criteria for any specific Somatoform Disorder." *DSM-IV-TR*, at 511.

diagnoses," under the heading, "Somatic Symptom and Related Disorders." *DSM-5*, at 309.[3] Thus, it would appear that the doctor who actually diagnosed Plaintiff with "somatoform disorder" did not have in mind the *DSM-5* criteria in making that diagnosis. Plaintiff appears to be suggesting that the ALJ should have seen the diagnosis of "somatoform disorder" in the record, consulted the *DSM-5*, decided that the actual diagnosis should have been "somatic symptom disorder" or something similar, and then analyzed whether Plaintiff's symptoms were consistent with the symptoms of that diagnosis—a diagnosis Plaintiff was not actually given. The Court finds no such requirement in the law.

Third, the Court finds that the ALJ's determination that Plaintiff's somatoform disorder "appeared to manifest mainly with the extremity tremor and spasms, which were short lived" (Tr. 29) was supported by substantial evidence in the record as a whole. This is not a case in which Plaintiff's treatment providers (or the consultative examiners) frequently or consistently diagnosed Plaintiff with somatoform disorder or attributed her symptoms to somatoform disorder or psychogenic factors. The only time Plaintiff was actually diagnosed with somatoform disorder was when she was admitted to the hospital overnight on March 21, 2014 following a visit to the emergency department. On March 21, 2014, Plaintiff presented to the emergency department stating that she was worried that she was having a stroke. (Tr. 951-52). She reported that starting the prior day, her right arm would just "flail" around in the air for unexplained reasons. (Tr. 941). Notes indicate that several episodes of flailing of the right arm and pelvic threshing were noted during the visit. (Tr. 962-63). She also complained of several other symptoms, including dizziness,

---

[3] The *DSM-5* states, "Individuals with somatic symptom disorder typically have multiple, current, somatic symptoms that are distressing or result in significant disruption of daily life (Criterion A), although sometimes only one severe symptom, most commonly pain, is present." *DSM-5*, at 311. It also states that "[t]he symptoms may or may not be associated with another medical condition." *Id.*

headache, intermittent vertigo, rapid pulse, high blood pressure, right hip and leg cramping, lower back pain, tremors in her right arm, flushed skin, not being able to walk in a very straight line, and needing to rely on her cane for ambulation. (Tr. 952). Head and neck CT scans were performed, and they showed no acute intracranial abnormality, volume loss, and sinus disease; no intracranial arterial abnormality; and no hemodynamically significant carotid stenosis. (Tr. 941).

The discharge notes contain several headings that appear to correspond to various symptoms Plaintiff complained of during her visit. Under the "Right arm twitching/flailing" heading, the notes state, "etiology unclear, does not appear to represent CVA [cerebrovascular accident] or a specific movement disorder, neurology consulted, MRI completed with final read negative, CT and CTA without acute abnormality or obvious cause." (Tr. 941). Also under that heading are the notes of the neurologist who consulted on Plaintiff's case. The neurologist wrote that that Plaintiff had "likely somatoform disorder" and that "[t]he movements are not neurogenic and likely psychogenic." (Tr. 941). The neurologist noted Plaintiff's many sources of stress and stated that he explained to Plaintiff that her symptoms were "not supported by neuroimaging" and "are not associated with any changes on the brain MRI." (Tr. 941). The discharge notes also state that one of Plaintiff's doctors (it is unclear whether it was the neurologist) explained to Plaintiff that diseases of the mind are as real as diseases of the body and recommended that Plaintiff seek psychiatric help, but she refused. (Tr. 941).

The discharge notes also contain a heading for "Hyperkalemia." (Tr. 942). Under that heading, the notes state, "[t]he movement disorder is very unlikely related to hyper kalemia, pt with Hyper kalemic periodic paralysis usually have paralysis and not writhing movements like she has had and she has other psychiatric issues that need psych follow up." (Tr. 942).

Under a different heading for "Headache, retrobulbar," notes state only that the MRI with contrast was negative for any definitive etiology. (Tr. 941). Under the heading for "Right leg pain," the notes state, "appears radicular in nature, patient states Percocet not helping, given Toradol while in the hospital. States she has a pain specialist Dr. Fowler that she goes to. Recommended continued follow-up." (Tr. 941). The notes under these two headings do not discuss somatoform disorder or psychiatric issues. It was noted that her admissions diagnosis had been ataxia, and her discharge diagnoses were somatoform disorder and psychiatric disorder. (Tr. 940).

These notes from Plaintiff's hospital visit support the ALJ's determination that Plaintiff's somatoform disorder mainly manifested primarily in extremity tremors and spasms, rather than in Plaintiff's pain or fatigue symptoms generally. The only discussion of somatoform disorder or psychiatric issues are placed under headings related to Plaintiff's tremors and movements. The doctor who suggested the diagnosis of somatoform disorder did so after neurological examination and brain imaging, but apparently without performing any analysis of Plaintiff's back symptoms, fatigue, or other symptoms.

Moreover, it is significant that although Plaintiff frequently presented to numerous other treatment providers and consultative examiners complaining of symptoms including lower back pain, upper back pain, headache, and fatigue, none of them ever attributed those symptoms to somatoform disorder or indicated that they were psychogenic in nature. Aside from the March 2014 diagnosis, the record appears to contain only three references to somatoform disorder, at least two of which are simply references to the diagnosis Plaintiff received during her March 2014 visit to the emergency department. On May 1, 2014, a record from Plaintiff's nurse practitioner includes the phrase, "muscle tremors in abd. extremities while in hospital - ? somatoform." (Tr. 1266). However, somatoform disorder is not included in the nurse practitioner's list of diagnoses. (Tr.

14

1266). On November 10, 2014, Plaintiff's chiropractor, in a narrative description of some of Plaintiff's medical history, stated, "[I]n March of 2014 she had what she thought was a TIA [transient ischemic attack] with a severe headache associated with right arm tremors. She took Aspirin and when it recurred the next day with an intense headache and flailing arm she went to the ER. The[y] diagnosed her with a somatoform disorder." (Tr. 1302). Additionally, in June 5, 2014, Plaintiff saw James Feuerstein, L.C.S.W., who diagnosed major depression, recurrent; anxiety; PTSD; and rule out somatoform disorder—illness anxiety disorder. (Tr. 1265). However, he did not diagnose Plaintiff with somatoform disorder.

Plaintiff has not cited, and the Court has not found, any other references to somatoform disorder, somatic symptom disorder, or psychogenic pain in the record from Plaintiff's treating providers. In addition, although Plaintiff was evaluated by multiple examining and non-examining doctors for her physical and mental symptoms, none of them diagnosed somatoform disorder or similar disorders.

To support her argument that many of her symptoms were affected by somatoform disorder, Plaintiff cites to notes suggesting that some providers recognized that Plaintiff's preoccupation with her physical or mental problems was exacerbating her mental problems. For example, the psychological consultative examiner, David Lipsitz, noted that Plaintiff's thought processes were preoccupied with her physical problems and stated, "Hopefully medication could help alleviate the mood disturbance so [Plaintiff] could take a maximal adjustment to her environment in light of whatever physical complications may be present." (Tr. 974). Similarly, Feuerstein wrote, "Thinking appears marked with cognitive distortions" and suggested that distortions in thinking might be affecting Plaintiff's moods. (Tr. 1287, 1507). However, neither Dr. Lipsitz nor Mr. Feuerstein suggested that Plaintiff's physical symptoms or her perception of

those symptoms was caused in whole or in part by psychological factors, and neither made a diagnosis of somatoform disorder, somatic symptom disorder, psychogenic pain, or any similar disorders.

In sum, in light of the fact that the doctors who diagnosed Plaintiff with somatoform disorder appeared to be primarily focused on Plaintiff' tremors, spasms, and extremity movements (and the absence of a neurological basis for those symptoms), and the fact that neither Plaintiff's treatment providers nor the consultative examiners attributed any of her other symptoms to somatoform disorder or related disorders, the Court finds that the ALJ's determination that Plaintiff's somatoform disorder mainly manifested in tremors and spasms was reasonable and supported by substantial evidence. Moreover, the ALJ's finding that Plaintiff's symptoms of extremity tremors and spasms were short-lived is also supported by the record. The medical record contains few, if any, references to extremity tremors, spasms, or movements in extremities after March 2014.

In addition, to the extent that Plaintiff's somatoform disorder might have been partially responsible for some of plaintiff's symptoms beyond her tremors, spasms, and extremity movements, the Court finds that the ALJ conducted a proper analysis of those symptoms in light of the record. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms, the Commissioner must "examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record." SSR 16-3p, 2017 WL 5180304, at *4. The Commissioner must consider several factors, including the claimant's daily activities; the duration, intensity, and frequency of the symptoms; the precipitating and aggravating factors;

the dosage, effectiveness, and side effects of medication; any functional restrictions; the claimant's work history; and the objective medical evidence. *See Moore v. Astrue*, 572 F.3d 520, 524 (8th Cir. 2009) (citing *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008), and *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)). *See also* SSR 16-3p, 2017 WL 5180304, at *7-*8 (describing several of the above factors, as well as evidence of treatment other than medication that an individual receives); 20 C.F.R. § 416.929(c)(3) (same).

The Eighth Circuit has recognized that although this analysis is complicated in cases involving somatoform disorders, because there is a "disconnect between the actual severity of symptoms demonstrated by clinical evidence and the way the applicant subjectively perceives the symptoms," it still must be performed. *Nowling v. Colvin*, 813 F.3d 1110, 1114 (8th Cir. 2016). The Eighth Circuit has stated:

> Given this disconnect, an obvious difficulty arises when it becomes necessary to make credibility assessments in cases involving somatoform phenomena. Subjective perceptions of somatoform effects may, in fact, be debilitating even when clinical or diagnostic medical evidence does not fully support the claimed symptoms. It nevertheless remains necessary to make credibility assessments in these settings, and "[i]n cases involving somatoform disorder . . . an ALJ is not free to reject subjective experiences without an express finding that the claimant's testimony is not credible." *Metz* [*v. Shalala*, 49 F.3d 374, 377 (8th Cir. 1995)]. Where such a finding has been made, "[w]e will not disturb the decision of an ALJ who considers, but for good cause expressly discredits, a claimant's complaints . . . even in cases involving somatoform disorder." *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001).

*Id.* at 1114. The Eighth Circuit has also found that "an ALJ may not find that a claimant with somatoform disorder lacks credibility solely because the claimant's self reporting of symptoms is not supported by objective medical data; that disparity itself is symptomatic of somatoform disorder, which 'causes [individuals] to exaggerate [their] physical problems in [their] mind[s] beyond what the medical data indicate[s].'" *Hamman v. Berryhill,* 680 F. App'x 493, 495 (8th Cir.

2017) (quoting *Easter v. Bowen*, 867 F.2d 1128, 1130 (8th Cir. 1989)) (emphasis added). However, an ALJ's reliance on such disparities in a case involving somatoform disorder does not necessarily require reversal; the ALJ's analysis of a claimant's subjective symptoms will be affirmed if "the remainder of the record . . . support[s] [the] ALJ's credibility determination." *Id.* (finding the ALJ's analysis of the plaintiff's subjective symptoms was supported by substantial evidence where the ALJ properly considered her conservative treatment history and daily activities, in addition to objective medical evidence, in a case involving somatoform disorder) (quoting *Chaney v. Colvin*, 812 F.3d 672, 677 (8th Cir. 2016)).

Here, a review of the record shows that the ALJ's analysis of Plaintiff subjective symptoms was supported by substantial evidence, even considering her somatoform disorder. As a preliminary matter, the Court notes that the ALJ did not entirely discredit Plaintiff's symptoms, but instead found that Plaintiff had severe mental and physical impairments and included several significant associated limitations in the RFC. The ALJ limited Plaintiff to light work, indicating that he partially credited her assertion that her back problems and other physical problems made her no longer able to do her past work as a chiropractor (classified as medium work). He limited Plaintiff's exposure to hazards such as unprotected heights and machinery, indicating that he at least partially accounted for her allegations of tremors, spasms, and dizziness. (Tr. 25). He also limited her to simple, routine tasks and simple work-related decisions, suggesting that the ALJ at least partially accounted for Plaintiff's testimony that she has difficulty concentrating and performing complex tasks due to pain, fatigue, or mental issues.

To the extent that the ALJ did not find all of Plaintiff's claimed symptoms created limitations that should be included in the RFC, the ALJ did so only after conducting an appropriate

analysis of the record and the relevant factors and making specific findings regarding the consistency of Plaintiff's asserted symptoms with the record. (Tr. 25-38).

First, although the ALJ did not rely exclusively on objective medical evidence, he did consider inconsistencies between Plaintiff's alleged symptoms and the objective medical evidence. (Tr. 34-35). This was proper with respect to those symptoms that ALJ found were not related to her somatoform disorder. For example, although Plaintiff has alleged that she has multiple disc herniations in the lumbar spine, the record does not contain diagnostic imaging showing disc herniations. (Tr. 34, 57, 200, 858, 1292). In addition, although Plaintiff alleged that she was extremely limited in her ability to sit and stand, the ALJ reasonably considered that she has rarely been observed to exhibit abnormal gait or station; has rarely had positive straight leg tests; has often had normal strength, sensation, and reflexes; and was rarely noted by her treatment providers to be using a cane (as she did when seeing the consultative examiner). (Tr. 26, 34, 59-60, 397, 398, 498, 499, 603-04, 624, 625, 954, 963, 1064, 1356). In addition, the ALJ reasonably noted that although Plaintiff alleged serious problems with concentration and attention, Plaintiff's mental status examinations have not revealed significant objective findings of problems in those areas. (Tr. 34-35). For example, the psychological consultative examiner found that Plaintiff's concentration was good, she had no memory problems for recent or remote events, she was able to repeat six digits forward and backward, and she could handle minor mathematical functions. (Tr. 973). The ALJ reasonably considered that the objective medical evidence did not support the extent of the symptoms Plaintiff alleged. *See Halverson v. Astrue*, 600 F.3d 922, 931-32 (8th Cir. 2010) (in evaluating subjective complaints, "the absence of objective medical evidence to support the complaints" is a proper factor to consider).

Second, the ALJ reasonably considered that Plaintiff has generally sought only conservative treatments for her problems. (Tr. 35). As the ALJ noted, although Plaintiff sought frequent chiropractic care for her back pain and headaches, she did not seek treatment from an orthopedist, neurosurgeon, pain management physician, or other medical specialist to manage her pain. (Tr. 35-36, 58). Her treatment has consistent primarily of chiropractic treatments and over-the-counter pain medications such as acetaminophen and naproxen, and she has not been prescribed narcotics on a regular or frequent basis. (Tr. 35). The ALJ also reasonably considered that although Plaintiff took medication for her mental impairments, there is no evidence that she pursued regular counseling treatment. (Tr. 35). It was proper for the ALJ to consider Plaintiff's conservative course of treatment in evaluating her subjective symptoms. *See Hamman*, 680 F. App'x at 495 (ALJ properly considered conservative treatment in assessing symptoms in case involving somatoform disorder); *Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998).

Third, the ALJ reasonably considered that Plaintiff has repeatedly reported improvement in her mental symptoms, back pain, headaches, and other pain symptoms and fatigue with medication and chiropractic treatment. (Tr. 35, 79, 1067, 1102, 1060, 1097, 1110, 1117, 1120, 1123, 1124, 1132, 1167, 1179, 1212, 1262, 1486). *Julin v. Colvin*, 826 F.3d 1082, 1087 (8th Cir. 2016) ("That [the plaintiff's] medication was effective in relieving her symptoms further supports the ALJ's finding that [the plaintiff's] complaints of disabling depression were not fully credible."); *Brace v. Astrue*, 578 F.3d 882, 885 (8th Cir. 2009) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling.") (internal quotations and citation omitted).

Fourth, the ALJ reasonably considered that Plaintiff has not always been compliant with her providers' treatment recommendations. (Tr. 35-36, 1061, 1094, 1090, 1081, 1374, 1378-79,

1384-88). *See Julin*, 826 F.3d at 1087 (ALJ properly considered the plaintiff's "resistance to some suggested courses of treatment" in assessing her subjective symptoms); *Guilliams v. Barnhart,* 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility.").

Fifth, the ALJ reasonably considered evidence of Plaintiff's daily activities that were inconsistent with her claimed limitations. (Tr. 36-37). For example, although Plaintiff alleged in her function report that she had very limited sitting, standing, and lifting abilities, could no longer do any gardening, and had difficulty performing even light tasks such as showering and vacuuming, Plaintiff's treatment records show that she frequently reported to her providers that she was performing strenuous activities such as shoveling snow (Tr. 738, 899); working outside doing gardening or yard work (Tr. 1057, 1071, 1101, 1104, 1210, 1196, 1376, 1378, 1488); shoveling mulch (Tr. 1110); lifting heavy bags (Tr. 1110); mowing the lawn (Tr. 1020, 1052, 1063, 1122, 1125); spending all day at the flea market buying and selling goods, which involved a lot of standing (Tr. 1052, 1384); moving boxes around at home (Tr. 1080); helping to lift a deep freezer up the stairs (Tr. 1528); doing painting around the house (Tr. 1101); doing plumbing jobs around the house (Tr. 1116, 1119, 1122); going shooting (Tr. 1389); detailing a car (Tr. 1394); doing water aerobics and yoga (Tr. 1452); and swimming (Tr. 1454). The ALJ reasonably found those reported activities not fully consistent with Plaintiff's allegations of pain and extreme fatigue. *See Davis v. Apfel*, 239 F.3d 962, 967 (8th Cir. 2001) ("Allegations of pain may be discredited by evidence of daily activities inconsistent with such allegations.").

Sixth, the ALJ reasonably considered Plaintiff's ability to perform some part-time work after the alleged onset date. (Tr. 37). On October 7, 2014, she told her treatment provider that her low back was achy in part because she was "standing more for her job." (Tr. 1101). On November

10, 2014, she told her treatment provider that at work, she sits about half the day, stands about half the day, does computer work some of the day, and reads about half the day. (Tr. 1302). In December 2014, she reported that she had seen two patients earlier in the week. (Tr. 1327). In February 2015, she reported doing a house call that involved an extended amount of manual lymphatic drainage the previous day. (Tr. 1354). On March 6, 2015, Plaintiff reported that she had been "working more this week than normal." (Tr. 1363). On August 3, 2015, she told her treatment notes indicate that she reported that she was "able to work all weekend without pain." (Tr. 1032). In May 2016, she also reported spending the weekend sitting in a chair for continuing education. (Tr. 1453). Plaintiff's ability to perform chiropractic work, even on a part-time basis, was a proper consideration for the ALJ. *See Harris v. Barnhart*, 356 F.3d 926, 930 (8th Cir. 2004) ("It was also not unreasonable for the ALJ to note that [the plaintiff's] daily activities, including part-time work . . . were inconsistent with her claim of disabling pain."). *See also* 20 C.F.R. § 416.971 ("The work, without regard to legality, that [a claimant] ha[s] done during any period in which [the claimant] believe[s] [he or she is] disabled may show that [the claimant is] able to work at the substantial gainful activity level . . . Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did.").

Seventh, the ALJ reasonably considered that Plaintiff made inconsistent statements to the consultative examiners and her treatment providers. (Tr. 36). For example, Plaintiff told the consultative examiner in February 2014 that she was only able to walk for 30 feet, to stand for 20 minutes, to sit for 10 minutes, and to lift 10 pounds; that she could not bend over or squat down; that she can cook but needs support to stand at the stove; that she cannot do other housework; and that she can go to the grocery store but has to use the cart for support. (Tr. 853). However, Plaintiff reported to her treatment providers that she shoveled snow at least twice in January and February

2014. (Tr. 738, 899). In addition, just a few months after her consultative examination, Plaintiff reported working in her garden, mowing her lawn, and doing plumbing jobs around the house. (Tr. 1122, 1125, 1196). These inconsistencies were appropriate for the ALJ to consider in assessing her subjective complaints. *See Julin*, 826 F.3d at 1087-88 (the fact that the claimant made contradictory statements to her physicians is a proper factor to consider in assessing subjective allegations); *Ply v. Massanari*, 251 F.3d 777, 779 (8th Cir. 2001) (noting that inconsistencies in the plaintiff's statements were a factor for the ALJ to consider in assessing a claimant's subjective complaints).

In sum, the Court finds that the ALJ conducted an express evaluation of Plaintiff's claimed symptoms, considered several of the relevant factors, and gave good reasons for finding those symptoms not entirely consistent with the record. The evaluation of a claimant's symptoms is "primarily for the ALJ to decide, not the courts." *Igo v. Colvin*, 839 F.3d 724, 731 (8th Cir. 2016) (quotation marks omitted). The Court must defer to the ALJ's evaluation of Plaintiff's subjective symptoms. *See Renstrom v. Astrue*, 680 F.3d 1057, 1065 (8th Cir. 2012) (citing *Juszczyk v. Astrue*, 542 F.3d 626, 632 (8th Cir. 2008)).

Aside from her argument concerning Plaintiff's somatoform disorder, Plaintiff does not challenge the RFC assessment on any other grounds. The Court's review of the record and the ALJ's decision shows that the ALJ conducted a detailed and careful analysis in which he discussed Plaintiff's allegations, discussed Plaintiff's medical records, assessed Plaintiff's subjective complaints, reasonably weighed the medical opinions in the record, and incorporated into the RFC those limitations he found were consistent with the record as a whole. That RFC finding is supported by substantial evidence. The Court acknowledges that the record contains conflicting evidence regarding Plaintiff's impairments, their causes, and the extent to which Plaintiff's

impairments limit her ability to function. However, the ALJ's decision fell within the available "zone of choice," and the Court cannot disturb that decision merely because it might have reached a different conclusion. *See Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011).

### C. The Determination That Plaintiff's Headaches Were Not a Severe Impairment

Plaintiff's second argument is that the ALJ erred at Step Two by finding Plaintiff's headaches were not a severe impairment. To show that an impairment is severe, Plaintiff must show that she has (1) a medically determinable impairment or combination of impairments, which (2) significantly limits her physical or mental ability to perform basic work activities. *See* 20 C.F.R. §§ 416.920(a)(4)(ii), (c); 416.921.[4] "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). The Eighth Circuit has noted that "[s]everity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard, and [the Eighth Circuit] ha[s] upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing." *Id.* at 708.

In discussing Plaintiff's headaches at Step Two, the ALJ acknowledged that Plaintiff has complained of headaches; however, he found the headaches were not a severe impairment, noting that they were "intermittent"; that "she generally reported good resolution of her headaches symptoms with medication, particularly over-the-counter Excedrin, and chiropractic and acupuncture treatment"; and that CT scans of the head have not documented objective findings of significant neurological abnormalities associated with her headaches. (Tr. 15).

---

[4] Several Social Security regulations were revised, effective March 27, 2017. In this Memorandum Opinion, the Court will refer to the version of the regulations that was in effect at the time of the ALJ's decision.

After review of the record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff's headaches were not a severe impairment. As Plaintiff points out, she did report headaches frequently; however, many of those headaches were described as "mild" or were noted to improve or resolve with over-the-counter medications such as Excedrin or cold medicine. (Tr. 725, 881, 919, 922, 925, 1057, 1060, 1063, 1067, 1088, 1093, 1102, 1105, 1110, 1116, 1131, 1209, 1218, 1221, 1224, 1227, 1517, 1520). Plaintiff also reported that Celexa and chiropractic care improved her headaches and decreased their frequency. (Tr. 1020, 1120). Plaintiff's testimony that she had migraine headaches once a month that lasted all day and caused her to become sick and unable to stand light and sound is not supported by her treatment records, which show that she only rarely reported migraine headaches or severe symptoms associated with her headaches. In light of Plaintiff's only intermittent reports of severe headaches to her treatment providers, as well as the evidence that Plaintiff's headaches improved with treatment, Plaintiff the Court finds substantial evidence in the record to support the ALJ's finding that Plaintiff's headaches did not significantly limit her ability to do basic work activities and thus was not a severe impairment. Thus, the Court finds no error at Step Two.

Moreover, even assuming that the ALJ erred by not finding Plaintiff's headaches severe at Step Two, that error does not require remand because it was harmless. An ALJ's error at Step Two in failing to find a particular impairment severe does not require reversal where the ALJ finds other severe impairments and considers all of a claimant's impairments, severe and non-severe, in his or her subsequent analysis. *See Spainhour v. Astrue*, No. 11–1056–SSA–CV–W–MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012) ("[E]ven if the ALJ erred in not finding plaintiff's shoulder injury and depression to be severe impairments at step 2, such error was harmless because the ALJ clearly considered all of plaintiff's limitations severe and nonsevere in determining

plaintiff's RFC."); *Givans v. Astrue*, No. 4:10–CV–417–CDP, 2012 WL 1060123, at *17 (E.D. Mo. Mar. 29, 2012) (holding that even if the ALJ erred in failing to find one of the plaintiff's mental impairments to be severe, the error was harmless because the ALJ found other severe impairments and considered both those impairments and the plaintiff's non-severe impairments when determining the plaintiff's RFC). *See also* 20 C.F.R. § 416.945(a)(2) ("If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' as explained in §§ 416.920(c), 416.921, and 416.923, when we assess your residual functional capacity.").

Here, even though the ALJ found Plaintiff's headaches were not a severe impairment, that determination did not remove those headaches from consideration by the ALJ. The ALJ discussed Plaintiff's headaches at several points in his RFC analysis. (Tr. 29, 34, 35). The ALJ also included in the RFC limitations that appear to account for the effect Plaintiff's headaches may have on her ability to concentrate on complex tasks, in that he limited Plaintiff to only simple, routine, and repetitive tasks. (Tr. 25).

For all of the above reasons, the Court finds that the ALJ's determination that Plaintiff's headaches were not a severe impairment does not require remand.

### D. Records Submitted to the Appeals Council After the ALJ's Decision

Plaintiff's third argument is that remand is required based on new evidence submitted to the Appeals Council. After the ALJ's decision, while the claim was still pending before the Appeals Council, Plaintiff submitted additional evidence to the Appeals Council. Although Plaintiff argues that this evidence was not made a part of the administrative transcript, precluding

proper court review, Defendant has now provided the evidence submitted to the Appeals Council in a supplemental transcript. (Tr. 1532-74).[5]

Where, as here, "the Appeals Council denies review of an ALJ's decision after reviewing new evidence, "[the Court does] not evaluate the Appeals Council's decision to deny review, but rather [it] determine[s] whether the record as a whole, including the new evidence, supports the ALJ's determination." *McDade v. Astrue*, 720 F.3d 994, 1000 (8th Cir. 2013) (quoting *Cunningham v. Apfel*, 222 F.3d 496, 500 (8th Cir. 2000)). *Accord Perks v. Astrue*, 687 F.3d 1086, 1093 (8th Cir. 2012). The Eighth Circuit has noted that this means that the Court "must speculate to some extent on how the administrative law judge would have weighed the newly submitted reports if they had been available for the original hearing," which is "a peculiar task for a reviewing court." *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994). *Accord Van Vickle v. Astrue,* 539 F.3d 825, 828 n.2 (8th Cir. 2008). In assessing the new evidence, "medical evidence obtained after an ALJ decision is material if it relates to the claimant's condition on or before the date of the ALJ's decision." *Cunningham*, 222 F.3d at 502.

Several of the records submitted to the Appeals Council are either dated either several years before the relevant time period, or dated after the ALJ's September 13, 2016 decision: a lumbosacral spine MRI from December 2002 showing a central bulge at L5-S1 and dessication of the L5-S1 disc with some narrowing (Tr. 1544); a pelvic CT from 2003 showing an abnormal thickening of the lower rectal wall with edema and/or infiltration within the perirectal fatty tissues (Tr. 1545); an abdominal CT from 2003 showing an enlarged liver but no other abnormalities (Tr. 1546); a head MRI from 2002 showing unremarkable results (Tr. 1547); and a brain MRI from

---

[5] Plaintiff has filed a response stating that she has no additional argument or response to the supplemental transcript. (Doc. 28).

2002 that was unremarkable except for "mild to moderate membranous thickening surrounding portions of the maxillary and ethmoid air cells bilaterally as well as a 1.5 cm polyp or cyst in the right frontal sinus" (Tr. 1548); a September 19, 2016 MRI of Plaintiff's left knee, showing a meniscus tear and other abnormalities (Tr. 1532); an October 2016 note showing Plaintiff was diagnosed with depression and fibromyalgia (Tr. 1574); the results of a questionnaire Plaintiff completed in December 2016 regarding her pain and the extent to which various activities cause her pain (Tr. 1534); a December 2016 questionnaire regarding Plaintiff's non-physical symptoms (Tr. 1536); and a medication list updated as of December 2016 (Tr. 1537-39). These records do not appear to show Plaintiff's condition during the relevant time period, and Plaintiff does not argue that any of these records show Plaintiff's condition during the relevant time period. Moreover, even if these supplemental records did show Plaintiff's condition during the relevant time period, the Court finds there is nothing in these records that would significantly undermine any of the ALJ's findings.

The Court has also considered the evidence of a lumbar spine MRI from April 2014. That record does not change the Court's opinion that ALJ's decision is supported by substantial evidence. The April 2014 MRI showed scoliosis and multilevel mild degenerative disc disease worse at L3-4 and L5, but no disc herniation or significant foraminal stenosis. (Tr. 1541). Those results are generally similar to the 2014 imaging that the ALJ reviewed and found showed facet arthritis and mild left lumbar scoliosis with degenerative disc disease at the L3-L4 and L5-S1 levels, but no disc herniations. (Tr. 26, 858). The Court finds no reason to believe that this new evidence would have, or should have, affected the ALJ's findings with regard to Plaintiff's back problems or other symptoms.

Finally, the Court considers the new records of a sleep study Plaintiff underwent in 2014. These records present a closer question. In his decision, the ALJ found that Plaintiff did not have a medically determinable impairment of obstructive sleep apnea, because the record did not contain any polysomnography results or other objective medical evidence from an acceptable medical source substantiating the presence of the condition. (Tr. 19). The new evidence presented to the Appeals Council, however, shows that evidence did exist showing that obstructive sleep apnea was a medically determinable impairment. On September 10, 2014, Plaintiff underwent a sleep study due to insomnia, moderate snoring, witnessed apneas, and excessive daytime fatigue and sleepiness. (Tr. 1551). Manojpal S. Dahuja, M.D., found that Plaintiff had "moderate obstructive sleep apnea with an AHI of 24 with the events being clearly worse in REM sleep. The patient also shows evidence of moderate periodic limb movements with a PLM index of 44." (Tr. 1551-52). It was noted that CPAP therapy should be initiated, and that "care should be exercised during driving and operating machinery until the patient's daytime symptoms are improved with therapy." (Tr. 1552). On September 26, 2014, Plaintiff underwent a CPAP titration study. (Tr. 1559-60). It was noted that "CPAP pressure of both 7, as well as 8cm, are clearly therapeutic for this patient's sleep apnea, including in supine REM sleep. CPAP tolerance was acceptable, but not optimal." (Tr. 1559). It was also noted that Plaintiff's "moderate to severe periodic limb movements . . . responded and improved significantly as CPAP titration progressed." (Tr. 1559).

When this evidence is considered, the Court cannot say that the ALJ's specific determination that obstructive sleep apnea was not a medically determinable impairment is still supported by substantial evidence. Nonetheless, the Court finds that even if the ALJ had considered this evidence and found obstructive sleep apnea to be a medically determinable impairment, the ALJ would not have included (or needed to include) any additional limitations in

the RFC beyond those he already included. Plaintiff did report fatigue or trouble sleeping fairly frequently, especially in mid-to-late 2014 (Tr. 728, 731, 874, 885, 911, 998, 1188, 1191, 1194, 1224, 1262, 1285, 1471, 1480, 1487). However, during much of the relevant period, her complaints of fatigue were only intermittent, particularly after she began using the CPAP machine in late 2014. Moreover, Plaintiff reported that her sleep symptoms improved with use of a CPAP machine. (Tr. 78, 1486). Consistent with this, the new records produced to the Appeals Council showed that the CPAP machine was "clearly therapeutic for this patient's sleep apnea, including in supine REM sleep" and that Plaintiff's "moderate to severe periodic limb movements . . . responded and improved significantly as CPAP titration progressed." (Tr. 1559).

In addition, the limitations already in the RFC appear to account for any limitations in functioning caused by Plaintiff's sleep apnea. The doctor who performed Plaintiff's sleep study stated that "care should be exercised during driving and operating machinery until the patient's daytime symptoms are improved with therapy," (Tr. 1552), and the RFC finding required that Plaintiff "avoid even moderate exposure to hazards such as unprotected heights and moving machinery," (Tr. 25). Moreover, to the extent that Plaintiff's fatigue caused mental difficulties such as difficulty concentrating on complex tasks, the RFC accounts for those limitations by limiting Plaintiff to simple, routine, repetitive tasks.

For all of the above reasons, the Court finds that even when the new evidence is considered, the ALJ's decision is supported by substantial evidence in the record as a whole.

### E. The ALJ's Duty to Develop the Record With Regard to Sleep Apnea

Plaintiff's final argument is that ALJ failed to fully and fairly develop the record with regard to Plaintiff's sleep apnea, because the record contained reference to a sleep study and the ALJ failed to obtain the results of the study. Because the results of the study are now in the record

and the Court has found that the ALJ's decision is supported by substantial evidence even when those records are considered, no remand is required based on this argument.

**VI.    CONCLUSION**

For all of the foregoing reasons, the Court finds the ALJ's decision is supported by substantial evidence. Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **AFFIRMED**.

_____
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE

Dated this 22nd day of March, 2019.